United States District Court
Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

FORTINET, INC.,

        Plaintiff,

    v.

FORTANIX, INC.,

        Defendant.

Case No. 20-cv-06900-MMC

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT; GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO EXCLUDE**

Before the Court are three motions, each filed January 14, 2022: (1) defendant Fortanix, Inc.'s ("Fortanix") "Motion for Summary Judgement"; (2) plaintiff Fortinet, Inc.'s "Motion for Partial Summary Judgment on Defendant's Laches Defense"; and (3) Fortanix's "Motion to Exclude Plaintiff's Expert Testimony of Mr. David Hanson." The motions have been fully briefed. Having read and considered the papers filed in support of and in opposition to the motions, the Court rules as follows.[1]

## BACKGROUND

Fortinet alleges it was founded in 2000, that it is "a global leader in the networking and security space," and that it has "continuously used" the mark "Fortinet" in connection with its goods and services. (See Compl. ¶ 7.) Fortinet also alleges that the United States Patent and Trademark Office ("USPTO") has issued to Fortinet three registrations for the mark "Fortinet" (see Compl. ¶¶ 12, 14, 16, Exs. 1-3), the most recent, issued in 2013, for "[m]onitoring of computer systems for security purposes" and "consulting

---

[1] By order filed February 23, 2022, the Court took the motions under submission.

United States District Court
Northern District of California

services in the field of maintaining the security and integrity of databases" (<u>see</u> Compl. ¶ 12).[2]

Fortinet further alleges that, "[l]ong after [it] began using the Fortinet mark," Fortanix began using the mark "Fortanix" in connection with "cybersecurity, encryption, and network security goods and services, including computer software platforms for ensuring secure execution of applications for providing security solutions across mobile, cloud, and enterprise platforms" (<u>see</u> Compl. ¶ 22), and that, in 2017, the USPTO issued to Fortanix a registration for its mark (<u>see</u> Compl. ¶ 61, Ex. 5).  According to Fortinet, the "use of the mark Fortanix causes a likelihood of consumer confusion when used with [Fortanix's] goods and services."  (<u>See</u> Compl. ¶ 22.)

Based on the above allegations, Fortinet asserts five Claims for Relief titled, respectively, "Trademark Infringement Under 15 U.S.C. § 1114," "False Designation of Origin Under 15 U.S.C. § 1125(a)," "California Statutory Unfair Competition Under Cal. Bus. & Prof. Code § 17200," "California Common Law Unfair Competition," and "Cancellation of U.S. Trademark Registration No. 5,289,135."

**LEGAL STANDARD**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, a "court shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." <u>See</u> Fed. R. Civ. P. 56(a).

The Supreme Court's 1986 "trilogy" of <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317 (1986), <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242 (1986), and <u>Matsushita Electric Industrial Co. v. Zenith Radio Corp.</u>, 475 U.S. 574 (1986), requires that a party seeking summary judgment show the absence of a genuine issue of material fact.  Once the moving party has done so, the nonmoving party must "go beyond the pleadings and by

---

[2] In addition to such registrations, the USPTO also issued to Fortinet a registration for "the 'Fortinet Logo.'"  (<u>See</u> Compl. ¶ 18, Ex. 4.)

1  [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on

2  file, designate specific facts showing that there is a genuine issue for trial." See Celotex,

3  477 U.S. at 324 (internal quotation and citation omitted).  "When the moving party has

4  carried its burden under Rule 56[ ], its opponent must do more than simply show that

5  there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586.

6  "If the [opposing party's] evidence is merely colorable, or is not significantly probative,

7  summary judgment may be granted." Liberty Lobby, 477 U.S. at 249-50 (citations

8  omitted).  "[I]nferences to be drawn from the underlying facts," however, "must be viewed

9  in the light most favorable to the party opposing the motion." See Matsushita, 475 U.S. at

10  587 (internal quotation and citation omitted).

**DISCUSSION**

12          In its motion for summary judgment, Fortanix argues it is entitled to summary

13  judgment on the issue of likelihood of confusion and on its laches defense, as well as on

14  Fortinet's claims for a reasonable royalty and for an award of corrective advertising.

15  Additionally, Fortanix seeks an order excluding the testimony of Fortinet's damages

16  expert, who has offered opinions on the amount of a reasonable royalty and the cost of

17  corrective advertising.

18          In its motion for partial summary judgment, Fortinet argues it is entitled to

19  summary judgment on Fortanix's laches defense.

20  **A.  Likelihood of Confusion**

21          As noted, Fortanix seeks summary judgment on the issue of likelihood of

22  confusion.  In that regard, the parties agree that each of Fortinet's claims requires a

23  showing of a likelihood of confusion as to the origin or source of Fortanix's goods, but

24  disagree as to whether such a likelihood of confusion exists.

25          The Ninth Circuit has identified the following factors, referred to as the Sleekcraft

26  factors, as relevant in determining whether a likelihood of confusion exists:  "(1) strength

27  of the mark; (2) proximity of the goods; (3) similarity of the marks; (4) evidence of actual

28  confusion; (5) marketing channels used; (6) type of goods and the degree of care likely to

be exercised by the purchaser; (7) defendant's intent in selecting the mark; and

(8) likelihood of expansion of the product lines."  See Rearden LLC v. Rearden

Commerce, Inc., 683 F.3d 1190, 1209 (9th Cir. 2012) (citing AMF Inc. v. Sleekcraft Boats

("Sleekcraft"), 599 F.2d 341, 348-49 (9th Cir. 1979).)  "These elements are not applied

mechanically; courts may examine some or all of the factors, depending on their

relevance and importance."  Au-tomotive Gold, Inc. v. Volkswagen of America, Inc., 457

F.3d 1062, 1076 (9th Cir. 2006).

**1. Strength of the Mark**

As explained by the Ninth Circuit, there are several types of marks:  (1) a "strong

mark is inherently distinctive, for example, an arbitrary or fanciful mark[,] [and] will be

afforded the widest ambit of protection from infringing use"; (2) a "descriptive mark tells

something about the product [and] will be protected only when secondary meaning is

shown;" and (3) "[i]n between lie suggestive marks which subtly connote something about

the products [and] will be protected without proof of secondary meaning."  See Sleekcraft,

599 F.2d at 349.

Here, as discussed in more detail below, Fortinet's products include firewalls, anti-

malware, and cloud security programs used by customers to secure networks and data.

Fortinet argues that a trier of fact reasonably could find the mark's combination of "fort"

and "net" subtly connote a connection between the products sold and internet security,

and, consequently, find the mark "Fortinet" is suggestive.  See Nutri/System, Inc. v. Con-

Stan Industries, Inc., 809 F.2d 601, 605 (9th Cir. 1987) (affirming characterization of

"Nutri" mark as "suggestive" when used in connection with "a weight control program

involving diet, exercise, counseling and the use of Nutri/System food products"; finding

mark "suggests, but falls short of explicitly describing, health and weight loss").  Although

Fortanix argues a trier of fact could, alternatively, find "Fortinet" is descriptive, a type of

mark entitled to "less protection" than a suggestive mark, see id., it fails to explain how

"Fortinet" would be understood as "defin[ing] qualities or characteristics of a product in a

straightforward way that requires no exercise of the imagination to be understood."  See

United States District Court
Northern District of California

Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery, 150 F. 3d 1042, 1047 n.8 (1998) (describing attributes of "descriptive" mark; providing "Honey Baked Ham" as example thereof; noting mark describes "a ham that has been baked with honey").

Next, although, as Fortanix points out, suggestive marks are "presumptively weak," see Brookfield Communications, Inc. v. West Coast Entertainment Corp., 174 F.3d 1036, 1058 (9th Cir. 1999), "advertising expenditures," as Fortinet points out, "can transform a suggestive mark into a strong mark, where, for example, the mark has achieved actual marketplace recognition" see id.; see also, e.g., Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc., 618 F.3d 1025, 1034-35 (9th Cir. 2010) (holding trier of fact reasonably could find suggestive mark was "strong," based on evidence plaintiff "spen[t] approximately $350,000 yearly marketing its footwear and that it sold 12,000,000 pairs of [trademarked] shoes" over three-year period). Here, Fortinet has offered evidence from which a trier of fact could reasonably find its mark is strong. Specifically, during the four years ending December 31, 2020, Fortinet "spent on average approximately $45-57 million per year in advertising in the United States" (see Romero Decl., filed January 28, 2022, ¶ 10), and has "sponsored numerous high-profile events and teams," including "the PGA Tour's Napa Golf Tournament, the BMW I Andretti Motorsport Formula E team, and the Rugby Championship" (see id. ¶ 13). Additionally, Fortinet's "revenues were approximately $2.2 billion in 2019 and $2.6 billion in 2020" (see id. ¶ 7), and, according to its Vice President of Corporate Marketing, Fortinet "ranks number one in the most security appliances shipped worldwide" (see id. ¶ 11).

Accordingly, a reasonable trier of fact could conclude this factor weighs in favor of finding a likelihood of confusion.

### 2. Proximity of Goods

The proximity-of-goods factor pertains to "the relatedness of the products and services offered." See Brookfield Communications, 174 F.3d at 1055.

Here, Fortinet offers evidence, undisputed by Fortanix, that Fortinet sells a number of products that perform "security and networking functions, including firewall, intrusion

1    prevention, anti-malware, VPN, application control, web filtering, anti-spam[,] and WAN

2    acceleration" (see Townes Decl., filed January 28, 2022, Ex. 2 at 3),[3] as well as "endpoint

3    security, cloud security, web-based application security, identity and access

4    management, sandbox protection[,] and email security" (see id. Ex. 2 at 4).  Additionally,

5    Fortinet offers evidence, undisputed by Fortanix, that Fortanix sells two products, first, a

6    "data security manager" that is "a unified solution for key management, encryption,

7    tokenization, and secrets management," and, second, a "confidential computing

8    manager" that is "a platform for building and running applications in a confidential

9    computing environment, thus securing data at runtime."  (See id. Ex. 33 at 40:9-41:8.)  In

10   short, as Fortinet's evidence demonstrates, both parties sell products used by customers

11   to secure the customers' networks and data.

12           Nevertheless, Fortanix argues, and Fortinet does not disagree, the two companies'

13   products "offer different capabilities" and customers can "purchase both Fortinet's and

14   Fortanix's . . . products and use them in a complementary manner."  (See Def.'s Mot. for

15   Summ. J. at 11:8-10.)  Although Fortanix contends that, under such circumstances,

16   customer confusion is not likely, a trier of fact, as Fortinet points out, reasonably could

17   find the complementary nature of the parties' respective products is not contrary to, but

18   instead supports, a finding of customer confusion.  See E. & J. Gallo Winery v. Gallo

19   Cattle Co., 967 F.2d 1280, 1291 (9th Cir. 1992) (holding "[w]here goods are related or

20   complimentary, the danger of consumer confusion is heightened"); American Int'l Group,

21   Inc. v. American Int'l Bank, 926 F.2d 829, 832 (9th Cir. 1988) (finding, where both parties,

22   although not "direct competitors," provided "financial services" with "minor overlap," trier of

23   fact reasonably could find "consumer confusion" was likely to exist).

24           Accordingly, a reasonable trier of fact could conclude this factor weighs in favor of

25   finding a likelihood of confusion.

26   _____

27           [3] Nicole R. Townes filed three declarations in connection with the pending motions.
     Unless the Court otherwise notes, all references to the "Townes Decl." are to Doc. No.

28   53-1, filed January 28, 2022.

United States District Court
Northern District of California

### 3.  Similarity of Marks

"[T]he similarity of the marks has always been considered a critical question in the likelihood-of-confusion analysis."  Fortune Dynamic, 618 F.3d at 1031-32 (internal quotation, omission, and citation omitted).

Here, the marks "Fortinet" and "Fortanix" both begin with the word "Fort," followed by a vowel and then ending in a three-letter word beginning with "n."  Where two marks begin with an "identical dominant term," such similarity alone "can foster confusion," see Century 21 Real Estate Corp. v. Sandlin, 846 F.2d 1175, 1179 (1988) (holding "similarity" factor weighed in plaintiff's favor, where plaintiff's mark "Century 21" and defendant's mark "Century Investments & Realty" used "identical dominant term 'Century'"), and, in the instant case, the Court finds a trier of fact reasonably could find the "dominant term" in each mark is "Fort."  Indeed, Fortanix's Rule 30(b)(6) witness acknowledged Fortanix chose its mark because it is a "security company . . . working on technologies like runtime encryption [and] secure enclaves," and "fort is a symbol of security" and "a symbol of an enclave."  (See Townes Decl. Ex. 33 at 47:4-9.)  Although Fortanix argues this factor weighs in its favor for the asserted reason that, it contends, its mark is pronounced "for-TAN-ix," while Fortinet's mark is pronounced "FORT-i-net" (see Def.'s Mot. for Summ. J. at 13:7-16), Fortanix offers no evidence to support a finding that consumers pronounce Fortanix in the way it has described, and in any event, "[t]here is no correct pronunciation of a trademark that is not a recognized word."  See StonCor Group, Inc. v. Specialty Coatings, Inc., 759 F.3d 1327, 1331-32 (Fed. Cir. 2014).

Accordingly, a reasonable trier of fact could conclude this factor weighs in favor of finding a likelihood of confusion.

### 4.  Actual Confusion

"Evidence that use of the two marks has already led to confusion is persuasive proof that future confusion is likely."  Sleekcraft, 599 F.2d at 352.  Here, Fortanix argues the record is devoid of any instances of actual confusion.

//

In response, Fortinet asserts that one instance of actual confusion has occurred, relying on an excerpt from an email chain between a potential customer and Avishai Ziv ("Ziv"), a Fortanix Vice President, during which email exchange the potential customer asked a question about how the seller's product would work in two specified scenarios and, in so inquiring, used "Fortinet" instead of "Fortanix." (See Townes Decl. Ex. 36.) Fortinet argues a trier of fact could find the potential customer's reference to "Fortinet" shows "he believes he is dealing with Fortinet or that Fortanix is affiliated with Fortinet." (See Pl.'s Opp. at 13:10-12.)

It is readily apparent from the portion of the email chain offered by Fortinet, however, that the potential customer had been in contact with Ziv prior to the date on which the proffered email chain begins. Specifically, the first email in the chain provided by Fortinet, written by Ziv, is a response to an earlier email from the potential customer, who appears to have used "Fortanix" as the "Subject" of that earlier email, and which Subject remains as a constant throughout the email exchange. (See id.) Additionally, Ziv several times makes reference to his company as "Fortanix," and the email address to which the potential customer sent his inquiry was, at all times, aziv@fortanix.com.

Although the limited evidence provided by Fortinet is weak, and, as Fortanix asserts, a trier of fact reasonably could find the potential customer was not confused as to the source of the product being discussed but simply misspoke, the Court is not prepared to find a trier of fact, as a matter of law, could not find the potential customer was actually confused.

Accordingly, a reasonable trier of fact could conclude this factor weighs, although perhaps only slightly, in favor of finding a likelihood of confusion.

### 5. Marketing Channels

"Convergent marketing channels increase the likelihood of confusion." Official Airline Guides, Inc. v. Goss, 6 F.3d 1385, 1393 (9th Cir. 1993) (internal quotation and citation omitted).

Fortanix does not address this factor in its motion, and although Fortinet, in its

United States District Court
Northern District of California

United States District Court
Northern District of California

1 opposition, cites to evidence identifying some marketing channels used by Fortanix (see,

2 e.g., Townes Decl. Exs. 33 at 110, 38 at 115-16, 236), it has not cited to evidence

3 showing it uses the same or similar channels.

4     Accordingly, on the record presented, this factor is essentially neutral.

5 **6.  Degree of Care Exercised by Customers**

6     "[W]hen the goods are expensive, the buyer can be expected to exercise greater

7 care in his purchase," see Sleekcraft, 559 F.2d at 353, and, when such circumstances

8 pertain, this factor weighs against a finding of likelihood of confusion, particularly where

9 the customers are "highly specialized professional[s]," see Accuride Int'l, Inc. v. Accuride

10 Corp., 871 F.2d 1531, 1537 (9th Cir. 1989).

11     Here, Fortanix offers evidence from which a trier of fact reasonably could find this

12 factor weighs against a likelihood of confusion.  Specifically, Fortanix offers evidence that

13 its customers do not "show[] up and put[ ] [a] credit card in and say[,] great, let's go buy

14 this," but, rather, that "multiple people" employed by its customers, in particular, the

15 customers' "technical" employees, are "involved in evaluating the solution" proposed by

16 Fortanix (see Jayaram Decl., filed January 14, 2022, Ex. 43 at 245:21 – 246:8),[4] the

17 length of the "sales cycle" is "just over six months" (see id. Ex. 43 at 255:12-16), and the

18 purchase price is "tens or hundreds of thousands of dollars" (see id. Ex. 43 at 257:21-23).

19 Fortinet offers no evidence to the contrary.

20     Accordingly, this factor weighs against a finding of likelihood of confusion.

21 **7.  Defendant's Intent**

22     Evidence that a defendant has an "intent to deceive" customers weighs in favor of

23 finding a likelihood of confusion.  See Official Airline Guides, 6 F.3d at 1394.

24     Here, Fortinet has offered evidence, undisputed by Fortanix, that Fortanix, at the

25 time it selected its mark, was aware of Fortinet's existence (see Townes Decl. Ex. 33 at

26

27     [4] Vivek Jayaram filed three declarations in connection with the pending motions. Unless the Court otherwise notes, all references to the "Jayaram Decl." are to Doc. No.

28 38-1, filed January 14, 2022.

United States District Court
Northern District of California

1   163:23-164:19), and, arguably, of the "Fortinet" mark as well.  Under such circumstances,

2   courts have found a presumption of an intent to deceive arises.  See Official Airline

3   Guides, 6 F.3d at 1394 (holding, "[w]hen an alleged infringer knowingly adopts a mark

4   similar to another's, courts will presume an intent to deceive the public"); but see HMH

5   Publishing Co. v. Brincat, 504 F.2d 713, 720 n.13 (9th Cir. 1974) (discounting evidence of

6   knowledge of identical mark; holding intent factor "relevant only in its negative

7   implications – i.e. where the absence of such knowledge can be shown, the existence of

8   intent is more difficult to establish").

9           Accordingly, a reasonable trier of fact could conclude this factor weighs in favor of

10  finding a likelihood of confusion.

11          **8.  Likelihood of Expansion**

12          Although "[a] strong likelihood that either party may expand his business to

13  compete with the other favors a finding of [likelihood of confusion]," see Official Airline

14  Guides, 6 F.3d at 1394, neither Fortanix nor Fortinet has cited to any evidence as to

15  whether either of the parties may, or may not, expand its business to compete with the

16  other.

17          Accordingly, on the record presented, this factor is neutral.

18          **9.  Conclusion as to Likelihood of Success**

19          As the Ninth Circuit has noted, "[g]iven the open-ended nature of this multi-prong

20  inquiry, it is not surprising that summary judgment on 'likelihood of confusion' grounds is

21  generally disfavored."  See Rearden, 683 F.3d at 1210; see also JL Beverage Co. v. Jim

22  Beam Brands Co., 828 F.3d 1098, 1105 (9th Cir. 2016) (observing, "we have cautioned

23  against granting summary judgment" on "likelihood of consumer confusion" grounds;

24  citing cases).

25          Here, a trier of fact reasonably could conclude five of the above-referenced factors

26  weigh in favor of finding a likelihood of confusion, specifically, the strength of the mark,

27  the proximity of the goods, the similarity of the marks, the existence of actual confusion,

28  and the defendant's intent, and that the remaining factors, other than the degree of care

United States District Court
Northern District of California

1   exercised by customers, are essentially neutral.

2       Accordingly, Fortanix has not shown it is entitled to summary judgment on the

3   issue of likelihood of confusion.

4   **B. Laches**

5       As noted, both parties seek summary judgment on Fortanix's laches defense.

6   Courts "analyze the laches defense with a two-step process." See Pinkette

7   Clothing, Inc. v. Cosmetic Warriors Ltd., 894 F.3d 1015, 1020, 1025 (9th Cir. 2018)

8   (internal quotation and citation omitted).[5]

9       The first step is to "assess the plaintiff's delay by looking to whether the most

10  analogous state statute of limitations has expired." See id. "If the most analogous state

11  statute of limitations expired before suit was filed, there is a strong presumption in favor

12  of laches." Id. "That presumption is reversed, however, if the most analogous state

13  statute of limitations expired after suit was filed." Id.

14      The second step is to "assess the equity of applying laches using the E-Systems

15  factors: (1) 'strength and value of trademark rights asserted'; (2) 'plaintiff's diligence in

16  enforcing mark'; (3) 'harm to senior user if relief denied'; (4) 'good faith ignorance by

17  junior user'; (5) 'competition between senior and junior users'; and (6) 'extent of harm

18  suffered by junior user because of senior user's delay." See id. (quoting E-Systems, Inc.

19  v. Monitek, Inc., 720 F.2d 604, 607 (9th Cir. 1983).)

20     **1.  Assessment of Length of Delay**

21      In a federal trademark infringement case filed in a California district court, "[t]he

22  most analogous state statute of limitations" is "California's four-year statute of limitations

23  for trademark infringement actions," see Pinkette, 894 F.3d at 1025, and "[l]aches runs

24  ————————————————

25      [5] Laches is a potential defense to each of the five Claims for Relief asserted by
    Fortinet.  See id. at 1030 (affirming trial court's finding that laches barred trademark

26  infringement and cancellation claims); American Int'l Group, 926 F.2d at 830-31 (finding
    triable issue of fact existed as to whether false designation of origin claim barred by

27  laches); Jarrow Formulas, Inc. v. Nutrition Now, Inc., 304 F.3d 829, 842 (9th Cir. 2002)
    (finding laches is cognizable defense to California claims for unfair competition; observing

28  "laches standards" under federal and state law "are substantially similar").

United States District Court
Northern District of California

1  from the time the plaintiff knew or should have known about its potential cause of action,"

2  id.

3  　　　Here, Fortinet filed the instant action on October 2, 2020.  Consequently, unless

4  Fortanix establishes Fortinet knew or should have known of its potential claims prior to

5  October 2, 2016, a "strong presumption" against laches exists.  See id.

6  　　　In support of its motion, as well as its opposition to Fortanix's motion, Fortinet

7  offers evidence that, in 2020, one of its account managers "discover[ed] the company

8  Fortanix and its business" (see Townes Decl. Ex. 1 at 131:20-132:8), and acknowledges

9  it had constructive knowledge of Fortanix's claim to the mark "Fortanix" on September 19,

10  2017, the date Fortanix's mark was registered.  See 15 U.S.C. § 1072 (providing

11  "[r]egistration of a mark on the principal registry . . . shall be constructive notice of the

12  registrant's claim of ownership thereof"); Park 'N Fly, Inc. v. Dollar Park and Fly, Inc., 469

13  U.S. 189, 202 (1985) (holding "[r]egistration of a mark provides constructive notice

14  throughout the United States of the registrant's claim to ownership" of mark); Pinkette,

15  894 F.3d at 1025 (holding date defendant's mark is registered is date plaintiff "should

16  have known" of its potential trademark infringement claims).  The Court next considers

17  whether Fortanix has submitted evidence sufficient to support a finding to the contrary,

18  and, in particular, a finding that Fortinet knew or should have known of its potential claims

19  prior to October 2, 2016.

20  　　　In that regard, Fortanix refers to two actions it took prior to that date.

21  　　　First, Fortanix offers evidence that, on September 18, 2016, it was operating a

22  website using the domain name www.fortanix.com, and that, on a webpage, it informed

23  the reader it was seeking to hire "engineers" and described itself as "an early-stage

24  startup" that, along with being "advised by top academic researchers and business

25  leaders" and "funded by top-tier Silicon Valley investors," was "transforming the security

26  industry with [its] platform where [it] eliminate[s], not reduce[s], a category of security

27  breaches."  (See Jayaram Decl., filed January 28, 2022, Ex. A.)  A plaintiff, however, is

28  deemed to have knowledge of potential trademark infringement claims when it is aware

the "infringing mark" is being or has been "used," see Brookfield Communications, 174 F.3d at 1061, and, here, as Fortanix acknowledges, it did not sell any products until 2017 (see Townes Decl., filed January 14, 2022, Ex. 22 at 171:2-13), nor has it otherwise identified any "use" prior to 2017.[6]  Moreover, although Fortanix cites authority holding the use of a mark in connection with a website may constitute the requisite "use," the cited authority explains that such "use" occurs only when "the website advertises or offers for sale any goods or services," see Icon Enterprises Int'l, Inc. v. American Products Co., 2004 WL 5644805, at *33 (C.D. Cal. October 4, 2004) (internal quotation and citation omitted), and Fortanix does not contend its website, on any date prior to October 2, 2016, advertised or offered for sale any goods or services.  Consequently, even assuming Fortinet knew or should have known of the above-referenced webpage on September 18, 2016, or any subsequent date prior to October 2, 2016, there is no evidence Fortinet knew or should have known at that time it had a potential trademark infringement claim against Fortanix.

Next, Fortanix relies on its having filed its application for trademark registration on September 28, 2016.  (See Townes Decl., filed January 14, 2022, Ex. 22 at 171:2-13.)  Even assuming, however, Fortinet knew or should have known of the filing of the application on September 28, 2016, or any subsequent date prior to October 2, 2016, Fortanix fails to offer any evidence to support a finding that Fortinet knew or should have known Fortanix was using its mark during such four-day period.  As noted above, Fortanix acknowledges it did not sell any products until 2017 and there is no evidence

_____

[6] For purposes of federal trademark law,  a mark is "deemed to be in use in commerce" on "goods" when the mark "is placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto, or if the nature of the goods makes such placement impracticable, then on documents associated with the goods or their sale, and . . . the goods are sold or transported in commerce," and with respect to "services" when the mark "is used or displayed in the sale or advertising of services and the services are rendered in commerce, or the services are rendered in more than one State or in the United States and a foreign country and the person rendering the services is engaged in commerce in connection with the services."  See 15 U.S.C. § 1127.

that at any time prior to October 2, 2016, it was using its website to advertise or offer for sale any product or service.

In sum, the earliest date on which Fortinet knew or should have known of its potential claims was September 19, 2017, the date it had constructive knowledge of Fortanix's claim to the mark "Fortanix," and Fortinet filed suit on October 2, 2020, slightly over three years from the date it had constructive knowledge of its potential claims.

Accordingly, a "strong presumption" exists that Fortinet's claims are not barred by laches. See Pinkette, 894 F.3d at 1025.

**2. Assessment of Equity of Applying Laches**

The second step, as noted, is to "assess the equity of applying laches using the E-Systems factors," see id., and, in this instance, as the period of delay is not more than four years, Fortanix has the burden of overcoming the "strong presumption" that laches does not apply, see id.

**a. Strength and Value of Trademark Rights Asserted**

As set forth above, a trier of fact reasonably could find "Fortinet" is a suggestive mark, and, further, that its mark has become strong in light of the significant marketing and advertising expenditures Fortinet has made. As Fortanix points out, however, the trier of fact is not obligated to find such expenditures transformed Fortinet's otherwise "weak" mark into a "strong one." See Nutri/System, 809 F.2d at 605 (affirming finding, made after court trial, that plaintiff's suggestive mark was "weak" in spite of plaintiff's having engaged in "extensive advertising" of its mark; noting "[courts] have rejected the contention that extensive advertising automatically transforms a suggestive mark into a strong one").

Accordingly, a triable issue of fact exists as to whether this factor weighs in favor of or against application of laches.

**b. Plaintiff's Diligence in Enforcing Mark**

The Ninth Circuit has held this factor weighs in favor of applying laches only where a plaintiff has filed its lawsuit after the "most analogous state statute of limitations" has

14

1   run.  See Pinkette, 894 F.3d at 1027 (holding plaintiff "was not diligent in enforcing its

2   mark," where it filed suit after analogous state statute of limitations had run); Internet

3   Specialties West, Inc. v. Milon-DiGiorgio Enterprises, Inc., 559 F.3d 985, 991 (9th Cir.

4   2009) (same).  Fortanix has cited no case, however, and the Court has not located one,

5   finding a plaintiff was not sufficiently diligent where, as here, its lawsuit was filed prior to

6   the expiration of the analogous state statute of limitations.

7           Accordingly, this factor weighs against application of laches.

8                        **c.  Harm to Senior User If Relief Denied**

9           As the parties acknowledge, in considering this factor, the trier of fact considers

10  whether a likelihood of confusion exists.  See RSI Corp. v. International Business

11  Machines Corp., 2012 WL 3277136, at *18 (N.D. Cal. August 9. 2012) (finding "[t]he

12  question of whether a senior user will be harmed if relief is denied turns largely on the

13  court's analysis of the likelihood of confusion); Internet Specialties West, Inc. v. ISPWest,

14  2006 WL 4568073, at *4 (C.D. Cal. November 14, 2006) (holding third factor weighed

15  against application of laches, in light of jury's prior finding defendant's use of mark was

16  "likely to cause confusion").

17          As discussed above, Fortinet has shown a triable issue of fact exists as to whether

18  Fortanix's use of its mark is likely to cause confusion.  Fortinet has not argued, however,

19  let alone shown, a trier of fact reasonably could not find an absence of a likelihood of

20  confusion.

21          Accordingly, a triable issue of fact exists as to whether this factor weighs in favor

22  of or against application of laches.

23                        **d.  Good Faith Ignorance By Junior User**

24          As the parties acknowledge, this factor considers whether the defendant acted

25  with wrongful intent.  See Pinkette, 894 F.3d at 1028 (holding, where defendant, prior to

26  adoption of its mark, was aware of plaintiff's mark, but credibly explained why it believed

27  its mark would not infringe, fourth factor weighed in favor of applying laches).

28          Here, as discussed above with regard to the Sleekcraft factors, a triable issue of

United States District Court
Northern District of California

15

1  fact exists as to whether Fortanix acted with a wrongful intent in adopting its mark.

2  Accordingly, a triable issue of fact exists as to whether this factor weighs in favor

3  of or against application of laches.

4  **e.  Competition Between Senior and Junior Users**

5  Where parties compete in the same market for the same customers, the fifth factor

6  weighs against applying laches, see Grupo Gigante SA de CV v. Dallo & Co., Inc., 391

7  F.3d 1088, 1091, 1104 (9th Cir. 2004) (holding fifth factor weighed against applying

8  laches where plaintiff sold groceries under name "Gigante" and defendant sold groceries

9  in same geographic area under name "Gigante Market"), whereas, if the parties do not

10  compete with each other, the fifth factor weighs in favor of applying laches, see Pinkette,

11  894 F.3d at 1028 (holding fifth factor weighed in favor of applying laches, where plaintiff

12  sold "t-shirts, tank tops, and sweatshirts" and defendant sold non-competing "high-end,

13  women's fashions").

14  Here, as noted, the parties' respective products are used by customers to protect

15  their websites and data.  As further noted, the parties agree that some customers use the

16  parties' respective products in a complementary manner, indicating that, at least on those

17  occasions, the parties share, as opposed to compete for, the same customers.  There is

18  no showing, however, that the parties never compete for customers.

19  Accordingly, a triable issue of fact exists as to whether this factor weighs in favor

20  of or against application of laches.

21  **f.  Extent of Harm Suffered by Junior User Because of Delay**

22  A junior user can show it was harmed where "it has continued to build a valuable

23  business around its trademark during the time that the plaintiff delayed the exercise of its

24  legal rights."  See id.

25  Here, Fortanix offers undisputed evidence that, in 2019, it raised $23,000,000, with

26  the goal of "expand[ing] all facets of Fortanix to meet the increasing demand for its [two

27  products]."  (See Jayaram Decl. Ex. 3.)  It is also undisputed that Fortanix increased its

28  marketing budget for the period comprising February 2020 to January 2021 by three

United States District Court
Northern District of California

1    times the amount it had expended during the period comprising February 2019 to

2    January 2020.  (See Townes Decl. Ex. 38 at 246:12-247:5.)[7]  Lastly, it is undisputed that

3    Fortanix, during the asserted period of delay, i.e., from September 19, 2017, to October

4    2, 2020, continued to sell its products.  (See, e.g., Jayaram Decl. Ex. 40 at 7 (identifying

5    sales revenues defendants made "through January 2020"));  Whittaker Corp. v. Execuair

6    Corp., 736 F.3d 1341, 1347 (9th Cir. 1984) (holding defendant was "prejudiced" by

7    plaintiff's delay in filing suit "because it continued engaging in its existing practices,

8    incurring additional potential liability by reason of [plaintiff's] failure to take prompt

9    action").  As Fortinet points out, however, the majority of the above-referenced marketing

10   budget increases occurred after Fortanix was served with a cease-and-desist letter.  (See

11   Townes Decl. Ex. 3.)

12         Accordingly, a triable issue of fact exists as to whether this factor weighs in favor

13   of or against application of laches.

### g.  Conclusion as to Equity of Applying Laches

15         As set forth above, one factor weighs against application of laches and the

16   remaining five factors present triable issues of fact, i.e., each could be found to weigh

17   either in favor of applying laches or against such application.  Although, as noted, the trier

18   of fact would begin with a strong presumption against applying laches, the Court declines

19   to find the trier of fact would be required, as a matter of law, to find laches does not apply.

20         Accordingly, neither party is entitled to summary judgment on the issue of laches.

21   **C.  Reasonable Royalty Award**

22         Fortinet's damages expert, David Hanson ("Hanson"), has opined that, should the

23   trier of fact determine Fortinet is entitled to a reasonable royalty, the royalty rate should

24   be 20% of the "sales realized by [Fortanix]."  (See Jayaram Decl. Ex. 40 at 7.)  Although

25   he acknowledges neither Fortinet nor Fortanix had ever entered into a royalty agreement,

26

27         _____

28         [7] Fortanix's figures are based on its "fiscal year," which runs from February to the
following January.  (See id. Ex. 38 at 246:12-22.)

17

United States District Court
Northern District of California

1    and, consequently, does not base his opinion on prior agreements by either party, he

2    reviewed databases of royalty rates agreed to by third parties.  (See id. Ex. 40 at 11-12.)

3    In particular, he states that one such database, with regard to "license rates for computer

4    programs," indicated that agreed-upon "trademark royalty rates range between 3 percent

5    and 10 percent of sales with an average rate of 8 percentage," and that a second such

6    database, with regard to "license agreements related to computer software and/or

7    hardware," indicated the "royalty rates in these agreements ranged from 1.25 percent to

8    75 percent, with the median rate at 10 percent and an average rate of between 17

9    percent and 22 percentage."  (See id. Ex. 40 at 12.)  He then determined, based on

10   allegations he assumed to be true, that, in this case, a 20 percent royalty would be

11   appropriate.   (See id. Ex. 40 at 12-15.)[8]

12          Fortanix contends Fortinet lacks evidence to establish its entitlement to a

13   reasonable royalty, and, consequently, seeks summary judgment on such claim.  In

14   addition, in its separate motion, it seeks an order excluding Hanson's testimony as to the

15   amount of a reasonable royalty rate.

16          "Reasonable royalties are a calculation of the hypothetical licensing royalties that

17   an infringer would have paid to the senior owner of a mark and can be recovered as a

18   measure of damages in trademark infringement cases."  Marketquest Group, Inc. v. Bic

19   Corp., 316 F. Supp. 3d 1234, 1300 (S.D. Cal. 2018).  "In the absence of a prior licensing

20   agreement between the parties, courts will permit reasonable royalty damages only if the

21   evidence provides a sufficiently reliable basis to calculate such damages."  Id.

22          Although the Ninth Circuit has not had occasion to identify what bases, other than

23   prior agreements between the parties, might suffice, it has noted that other circuits have

24   allowed a reasonable royalty to be based on "the senior user [having] negotiated a

25

26          _____

27          [8] Hanson assumed, for example, that the parties are "direct competitors" and that
     there has been "at least one instance of marketplace confusion," which assumptions, if
28   true, would in his opinion "exert an upward pressure on the royalty rate."  (See id. Ex. 40
     at 12, 13.)

license with someone other than the [junior user]" or on "prior negotiations between the parties."  See M2 Software Inc. v. Viacom Inc., 223 F.3d 653, 655 (9th Cir. 2007); cf. Oracle Corp. v. SAP AG, 765 F.3d 1081, 1089, 1091-92 (9th Cir. 2014) (holding award of reasonable royalty in copyright cases requires evidence to establish "objective non-speculative license price"; finding evidence presented by plaintiff too speculative to support reasonable royalty award and noting plaintiff "faced an uphill battle" where plaintiff "ha[d] no history of granting similar licenses, and ha[d] not presented evidence of 'benchmark' licenses in the industry approximating the hypothetical license in question"; citing, as examples of "non-speculative awards," cases in which parties either had preexisting license agreement or had conducted negotiations concerning license prior to infringing conduct).

Here, Fortinet does not contend the parties have or had a prior licensing agreement or, indeed, that either party has ever had a licensing agreement with anyone or attempted to obtain such an agreement.  Rather, citing three cases that allowed a senior user to base a reasonable royalty theory on something other than prior license agreements or negotiations, Fortinet contends neither a prior licensing agreement nor a prior negotiation is required.

Two of the cases cited by Fortinet are, however, readily distinguishable.  In QS Wholesale, Inc. v. World Marketing, Inc., 2013 WL 1953719 (C.D. Cal. May 9, 2013), the district court found a reasonable royalty rate could be based on "a detailed record of business negotiations between [the parties] regarding the outright purchase of the mark by [the junior user]," see id. at *5, and, in ITT Corp. v. Xylem Group, LLC, 963 F. Supp. 2d 1309 (N.D. Ga. 2013), the district court found a reasonable royalty rate could be based on "three separate transactions in which [the junior user] acquired another company's trademark through a merger and acquisition."  See id. at 1332.  Here, by contrast, Fortinet cites no evidence that either party has purchased, or even attempted to purchase, the trademark of another.

In the remaining case cited by Fortinet, Active Sports Lifestyle USA LLC v. Old

19

United States District Court
Northern District of California

1    <u>Navy, LLC</u>, 2013 WL 11239385 (C.D. Cal. November 21, 2013), in which the parties were

2    competitors in the "apparel" industry, the district court, while noting other cases had

3    "excluded expert evidence identifying a reasonable royalty rate as too speculative in the

4    absence of a previous licensing agreement or negotiations between the parties," allowed

5    the plaintiff to seek a reasonable royalty based on an expert's opinion that was based on

6    a rate he derived from "licensing agreements in the apparel industry," <u>see id.</u> at *1, *17; in

7    so holding, the district court essentially treated other companies in the apparel industry

8    as sufficient proxies for the parties to that action.  Here, however, as Fortanix observes,

9    Hanson has not based his opinion on licensing agreements in the field in which Fortinet

10    and Fortanix compete, which he described as "data or cybersecurity," but, rather, as

11    noted, on agreements reached by companies who licensed "computer programs," as well

12    as "computer software and/or hardware" (<u>see</u> Jayaram Decl. Ex. 40 at 12), fields which

13    Fortinet fails to show, or even argue, are similar to the cybersecurity field in which

14    Fortinet and Fortanix compete.

15         Accordingly, as Fortinet has not shown a triable issue of fact exists as to its claim

16    for a reasonable royalty, Fortanix is entitled to summary judgment on such claim, as well

17    as an order excluding Hanson's testimony as to the amount of a royalty.

18    **D.  Corrective Advertising Award**

19         Hanson has opined that, if the jury determines a damages award "should include

20    some form of corrective advertising," an appropriate sum would be "approximately $4.4

21    million." (<u>See</u> Jayaram Decl. Ex. 40 at 7, 16.)  In providing such opinion, Hanson has

22    been asked by Fortinet to assume there has been "harm caused by Fortanix's trademark

23    infringement" and further that a corrective advertising campaign, consisting of "radio

24    advertisements, Google advertisements, digital advertisements, and advertising in

25    industry trade publications," is necessary and would last for "a period of approximately

26    two months." (<u>See id.</u> Ex. 40 at 15-16.)

27         "An award of the cost of corrective advertising, like compensatory damage awards

28    in general, is intended to make the plaintiff whole."  <u>Adray v. Adry–Mart, Inc.</u>, 76 F.3d

984, 988 (9th Cir.1995).  "It does so by allowing the plaintiff to recover the cost of advertising undertaken to restore the value plaintiff's trademark has lost due to defendant's infringement."  Id.  Such an award, however, is "appropriate only where a plaintiff has shown that in fact it has been injured," or, put another way, "that the mark lost value."  See Marketquest Group, 316 F. Supp. 3d at 1301 (finding, where plaintiff offered evidence of actual confusion and that its sales and profits decreased after asserted infringement began, plaintiff entitled to have jury consider whether to award cost to conduct corrective advertising); see also HM Electronics, Inc. v. R.F. Technologies, Inc., 2015 WL 1757804, at *1, *3 (S.D. Cal. April 17, 2015) (holding triable issue of fact existed as to plaintiff's claim for cost of corrective advertising, where record included evidence of "customer confusion").

Here, as Fortanix observes, Hanson's ability to provide his opinion is dependent on Fortinet's establishing the underlying facts Hanson has assumed, and argues Fortinet has not identified any evidence to support a finding that its mark has lost value, the one alleged instance of "actual confusion" being, according to Fortanix, nothing more than "a typo."  (See Def.'s Mot. for Summ. J. at 14:26.)  In response, Fortinet asserts it will "present evidence of harm to its marks," citing said one alleged instance of "actual customer confusion."  (See Pl.'s Opp. at 25:3-5.)  As discussed above with regard to the Sleekcraft factors, a triable issue of fact exists as to whether that email exchange evidences actual confusion.

Accordingly, Fortanix has not shown a corresponding triable issue of fact does not exist as to Fortinet's entitlement to an award based on the cost of corrective advertising or that Hanson's opinion as to the amount thereof should be excluded.[9]

//

//

_____

[9] The Court makes no finding herein as to whether a single instance of actual confusion suffices to support an award of the cost of corrective advertising, let alone in the amount claimed here, neither party having addressed those issues.

**CONCLUSION**

For the reasons stated above:

1.  Fortanix's motion for summary judgment is hereby GRANTED in part and DENIED in part as follows:

      a.  To the extent Fortanix seeks summary judgment on Fortinet's claim for a reasonable royalty, the motion is GRANTED; and

      b.  In all other respects, the motion is DENIED.

2.  Fortinet's motion for partial summary judgment is DENIED.

3.  Fortanix's motion to exclude Hanson's opinions is GRANTED to the extent Hanson has offered an opinion as to the amount of a reasonable royalty and is otherwise DENIED.

**IT IS SO ORDERED.**

Dated: April 15, 2022

MAXINE M. CHESNEY
United States District Judge